Good morning. Good morning, Your Honors. I am Tom Beck, and I'm here for Mr. Neidermeyer as the appellant. I will reserve a few minutes for rebuttal. How many? Two, perhaps. Okay. Maybe three. I want to say that I think the briefs that were submitted before the Court speak for themselves, but I do want to point out a couple of important details which I think this appeal presents and that the overarching issue is that there were multiple material issues of disputed fact that should have been tried on the issues of reasonable suspicion on the issue of probable cause. Well, let me ask you this, counsel, at least as I look at the case so far, I don't like the Supreme Court's qualified immunity jurisprudence in a lot of cases. It does seem to impinge on what we would normally consider summary judgment matters. But that's what happens. That's when you're dealing with law enforcement, that's what we're dealing with. And I'm struggling with how we cannot find that Officer Caldwell has qualified immunity for the traffic stop, for the arrest, for the malicious prosecution. I don't find any case that directly says to the contrary. Aren't we stuck with that? I mean, I know you don't like it. I may not like it, but that's the reason why you don't have a trial is because of the doctrine of qualified immunity. What do we do about that? Well, what I presented to the District Court, and again here, and that is if you have material disputed issues of fact on all three subject matter, malpras, reasonable suspicion, and which were in the record, you don't get the qualified immunity. That has to be resolved by a jury. And let me just make a couple highlights. On the issue of probable cause, the Court pointed out that there was this suggestion by the officer that the eyes were not rebounding in the one to two seconds that they're supposed to. He admits that that's not a complete examination for probable cause, yet the Court used it. But where's the disputed fact there? You're quite correct that if there are disputed issues of fact, that they may potentially preclude qualified immunity, and that would then be a trial. But focusing your arguments just on the issues that are either undisputed or cannot be disputed, such as the officer's observations on the nystagmus result, how does that not give the I couldn't find a clearly established case that would tell the officer that he didn't have probable cause to arrest under these circumstances. Well, there are several, and I want to point out the biggest one, that if I ever get to the jury, I'm going to call to the Court's attention or their attention immediately. Every time Mr. Niedermeyer asked this officer why he was being arrested, there are eight times on that recording, which is the most probative evidence we have, he tells him because he wouldn't tell him where he was going. He never suggests that he believed he was under the influence. He lied about the fact that he refused FSTs, as the videotape clearly shows there was no offer in FST. And to your point on the eye rebound, the officer maintained that that reaction he spotted when ambient light was changed. The videotape taken by the passenger in the car shows when the nystagmus test was being on the defendant's eyes, the suspect at the time, ambient light didn't change. It remained constant. So he was lying about that too. And qualified immunity doesn't go to a dishonest cop. Somebody who lies about the issues of probable cause is really not entitled to qualified immunity. Those were disputed material facts on the issue of probable causes I've just pointed out to you. Nervous and fidgety. The videotape turns that out. The fact that he lied about the FST. The fact that he tried to walk away from the car. Remind me on the evidence. After he was arrested, he did say that he's not going to engage in any FSTs other than a breathalyzer, right? But you're saying that prior to that point, there was never refusal of FSTs? That's the law. You've got to have probable cause for an arrest for a DUI and all the things that an officer needs to know, which we, by the way, supported with expert testimony that the court completely ignored, which called Officer Caldwell's allegations into question. Let me just interrupt just one thing. I know I want you to answer my colleague's question, but are you really seriously contending that when your client was weaving around, which was photographed, that there was no Yes, because Collin, the case that I cited, requires that for a 21-658 violation to occur or probable cause for that to occur, there's got to be more pronounced over a longer distance. And the district court agreed with me and distinguished Collin on the idea that when he made a signal lane change when the cop got behind him, that that was a dangerous lane change. The cop claimed that that caused that vehicle in that lane to take evasive action. That's enough, right? But it didn't happen. The videotape disproves it. It disproves it. And the argument I'd like to point out, and by the way, I cited a Harvard Law Review article that was only called to my attention two days ago that speaks to this very issue. Is that a prudentially favorable source? Well, I think it's influential. It talks about whose eyes are you going to believe when you watch a piece of videotape. And parenthetically, I went back to Scott and I saw that after reading that article that Justice Stevens was taking offense at the fact that the majority said it would be unreasonable to view that Scott chase any other way. And he says, well, I looked at it and I felt that it was reasonable. Okay. I apologize for interrupting the question that my colleague asked, but I was so surprised that you said what you did, I thought I better ask. Because to me, there's just absolutely no question he had the right to stop your client based on what he did. I would disagree with that only because the case law that we cited does not make that a violation. If he's going to lane straddle or change lanes or even move within a lane, it's got to be greater than that. Well, it's not just the lane change, though. It's really coupled with the unsafe lane change. And so with Justice Smith on that one, I think the closer call is on the arrest. So that's why I'm focusing on the undisputed facts and focusing on the case law. We're talking about qualified immunity here, not a de novo sort of review. It's what tells the officer that he wasn't entitled to arrest under those circumstances. So I think you did answer my question with regard to the FSTs. We can't see on the videotape, the two videotapes, whether the officer offered field sobriety tests or whether in his judgment that they wouldn't have. No. The fact is that he maintained that those tests were offered, wrote a report that they were, and presented that to a prosecutor, as you know from the evidence, that a prosecutor relied on that representation was categorically false. Mr. Niedermeyer cooperated with the officer when he had him stick his head out the window and do the nystagmus test that was done, and in which they later claimed, because the reports don't reflect this, he later claimed that that rebound feature existed. The officer himself admits that the rebound feature doesn't tell you he's got probable cause. Those are material issues as to probable cause, and if material issues as to probable cause exist before the court, and competently, as we believe we did that, then the court can't grant qualified immunity. Do we get to consider his behavior prior to the time that he was put in the car in the evaluation of probable cause? Yes. Talking fast, acting strangely, getting on the ground? That's what the cop says. Well, I could see it on the videotape. How would you know what he talks fast like unless you compare it to what you knew if he spoke in the courtroom today? You can't say that. He was not nervous and fidgety. He was not disobedient or unable to comply with commands. He did exactly what he was told to do and was so fearful of his officer. And the point that I want to bring out is the officer telling him to lie down on the ground? No, he did not. But this man's profession and his experience from what he read in the papers is that he was fearful this man would hurt him. It starts with him. Sure, but that's not the right inquiry, though, right? I mean, it may be that he always speaks very fast. We're talking about the perspective and objective perspective of a reasonable officer at the scene. So it may be that he always speaks rapidly. It may be that he has perfectly good justification for all of a sudden lying on the ground when not directed to do so. The question, though, is whether a reasonable officer could draw some deductions from that conduct as to whether he's under the influence or not. Isn't that the right inquiry in this case? That is the inquiry, but you don't get there until such time as you determine whether or not that would tell a DRE, as Caldwell claimed to be, that this person was under the influence of anything, including a CNS. You're saying you've got to have proof of being under the influence before the officer can get qualified immunity. Is that what you're saying? I think in the calculus that goes into a probable cause equation that precedes qualified immunity, you can't get to qualified immunity if those material facts are called into question by confident evidence. You know, you should argue that to the Supreme Court. They're not going to agree with you, but that's what you should do, because I've stuck with where my colleague is. We've been told by the Supreme Court that we have to look at these things from the eyes of a reasonable officer on the scene, not whether that's exactly what happened, but whether a reasonable officer could have believed that what this officer said occurred occurred. That's what we're dealing with. And contrast that to the partner whose testimony conflicted with the reasonable police officer on the issue of the traffic driving. He said that the guy never drove erratically, did not make a dangerous turn, did not cause any kind of commotion that the court seemed to rely on. So Caldwell is not that universal reasonable person because an equally well-trained officer sitting in the same car at the same time disputed it and didn't come to that conclusion. And on the issue of probable cause for arrest, the testimony showed that Officer Carter, I think was his name, the partner, when asked about his objective symptoms analysis said they didn't find any. So which officer can we trust? If the fact that Caldwell comes in and says I found all these things and I'm looking at this and I reached these deductions, if that were true, then why didn't he tell Mr. Niedermeyer what the cause for the arrest was on each occasion that he asked them? If he was of that mind, he could have simply said because I believe you're under the influence. He never did. And in fact, every single time that subject matter came up, he says the opposite. He said you didn't answer me where you were going. That, I mean, do I really need settled case law to know that an officer can't arrest a person for refusing to answer that question? Unfortunately, you do under Pearson. I don't necessarily like that, but that's what the Supreme Court says. Well, I don't think you get the qualified immunity because of what I told you. Where's the case? That's what I'm struggling with. I have empathy for your client, but we're bound by the Supreme Court. The Supreme Court says we've got to have a case. I don't see the case. Because I don't want to get the qualified immunity when you got me disputed. Of course you don't. But you can't do, I mean, the case law supports me on this. A court, a district court cannot grant qualified immunity if there are materially disputed facts. And if there are materially disputed facts, they have to be taken in the light most favorable to the non-moving party, and this court didn't do that. Well, you get to that point. I have a case that just came out called Lopez, the State of Lopez. I wrestled with that big time. I empathize with you enormously. But the reality is in that case we had the partner and even the officer himself saying the gun never came up. He was never in danger. So that's a little different. But the standard that my colleague just mentioned is the one that we deal with generally, which is the reasonable officer from his perspective. And you also have to have a case that shows that your client's position was understood, would have been understood by the reasonable officer that he or she was violating the constitutional rights of your client. I don't see the case. I really don't. I empathize with your position. As I said, Lopez is that very kind of case of wrestling with that very point. I got that. Let me turn to the point on the other. Do you want to save any of your time, by the way? Up to you. I'm into it already. Yes, you are. It's up to you. You can use it all up if you want. Let me talk about the pat-down. Okay. The court's granting the summary judgment on the pat-down and then later taking it away in the recon motion, I think it was abuse of discretion. We did, when we learned about that evidence that made that claim whole, I did exactly as Desert Drain and Apache allowed me to do, and it was wrong for the court to take that ruling away from me. But we do judge that based on an abuse of discretion, right? That is correct. Okay. Thank you. All right. So you saved the rest of your time. But we'll hear from the government. Good morning, Your Honor. Good morning. David Agito, DAG's office, on behalf of Dia Pelli. We are lucky in this case, Your Honors, because we have video and audio of the incident in question. The people who recorded these videos or the audio may have biases, may have prejudices, may have faulty memories, but not the videos. Counsel had indicated that the, if I recall correctly, what he said is the video shows that the ambient light turned on the stagmas, and the quality of the video, frankly, isn't that good, or maybe I didn't look at it closely enough. What does it show with regards to the stagmas? Can that be considered an undisputed fact? Or is there something in the video that would give grounds for Mr. Niedermeyer to say that he performed well on the stagmas? The video is flawed at the beginning of it, but then thereafter, it's clear. Now, with respect to the modified stagmas test, you clearly see the officer asked the driver to stick his head out of the window so that he can perform the test. As the test is being performed, you can see the light. Now, the light is not flashed directly into the eyes of the driver, because that's not how you conduct the test. The area where the stop occurred was dark, so the flashlight is providing the ambient light. It's undisputed. Without the flashlight, there's no light. It's a dark place where the arrest occurred. So the flashlight provides the ambient light, and the officer is looking at the driver's eyes. Now, my colleague stated that they were rebounding. No, the pupils, the eyes were not rebounding. That is not what the officer testified to, because that would show nystagmus. The officer was clear. There was no nystagmus. However, what he saw in the ambient light provided by the flashlight, I mean, it's clear that he's using the flashlight. What he saw was the pupils retracting approximately two to three seconds when normally an unimpaired driver, the pupils would retract within a second. It is what it is. It is on the videotape. And what the district court did in determining that Officer Caldwell was entitled to qualified immunity, but also, and it's rare that district courts do the two prongs, that also that there was no violation of the Fourth Amendment in this case, is that it looked at those parts of the videos that were clear and basically set down everything that the video showed. Could you just break down, what are the elements that determine probable cause here? What were the factors that gave the officer Caldwell the conclusion that he had probable cause for arrest? And particularly, I'm interested in knowing whether refusing to answer a question as to what his destination was that night was part of that analysis. No. The driver was within his right not to respond to that question. That is not the basis of the probable cause determination made by the officer. What the officer, in coming to probable cause, and I'm assuming you're asking about the actual arrest, not the reasonable suspicion needed. I'm talking about the arrest. Thank you. The probable cause was everything that occurred prior to the officer pulling over the driver. Can you list the undisputed facts, sum up the undisputed facts that a reasonable officer would rely on under these circumstances? Absolutely, and this is what the district court did, and this is what the video shows. You see the vehicle, the driver's vehicle, drifting. It's in the number two lane, so the number one lane is the fast lane. The number two lane is the middle lane. The number three lane is the slow lane. When the officer first sees the driver, the appellant's driver, he's in the number two lane. Unfortunately, we do not see this part in the video when the driver crosses over to the number three lane, forcing a car that was there to move to the right in an effort to avoid a collision. That we don't see in the video, but that is not what the court took into consideration. What it took into consideration is what happened next, which is clearly viewed on the video, which is the vehicle drifting to the left of the number two lane. Is drifting the same as swerving all over the road, as was characterized by Officer Caldwell? Well, yes, swerving would be in my book more than once. So at this moment, at the beginning, we see the vehicle drifting to the left. The tires, and the district court noted that there's a question as to whether or not the tires cross over the line or drive over the line. But for purposes of giving the plaintiff the benefit of the doubt, it considered that the tires did not cross over the line. So let's say for purposes of the motion for summary judgment that it didn't. It just drove over the line for about five seconds. Let me be sure I understand something. If I recall correctly, this initial move was caused allegedly by the defendants looking at his device for texting or something. Is that in the record? Is that correct or what? Yes, yes, Your Honor. This is something that the appellant first testified at his deposition in the civil action. Mind you, before that, there was an administrative hearing in front of the DMV. At that point, as Your Honor pointed, there was no question, and even the plaintiff, the appellant admitted, that there was justification for the initial stop. Now, there was no mention of supposedly drifting over to the left because he was looking at directions on a phone, his girlfriend's phone, which was on the other side of him. Well, let's get on with the other elements of probable cause because assume for the moment that there's reasonable suspicion to make the arrest because of the lane change. Okay. So you've got the drifting left, drifting right, and, again, once the – Just list them. List them. You've got the drifting. Drifting in number two. You've got the unsafe lane change. You've got the nystagmus. What else? Focusing on the undisputed facts. What do you have? Okay. Then you have the application of the brakes for no apparent reason before the CHP cart lights up the suspect vehicle. And this is important, Your Honor, because Officer Caldwell is a DRE, and in his experience, this is something that happened on a weekend night, past midnight. In his experience, that's where you see a lot of DUI, and that's why he's attuned at that time of the day and night as to the movement of the vehicle. So he takes that also into consideration. So that's the reasonable suspicion. And then you add – Can I move this along? I think you're going to run out of time. As I understand it, because we want to know what is your position, the appellant first moved to the left, apparently looking at his device, apparently recognized he had to get back in line. He goes, swerves to the right, but goes so far to the right that he affects, allegedly, another car coming in back, forces him to stop. Then he comes back into the lane. Is that a fair statement of what the officer saw? No. Okay, what did I miss? He goes to the left, rides onto the lane, then goes back into the middle of the lane, puts on his blinker, and within a split second goes into the number three lane a few feet behind the car that just passed him. Once he's in the number three lane, then he starts drifting again to his right. And then he comes – and then you see an application of the brakes. Then he comes back into the middle of the lane, and then that's when Officer Caldwell lights him up. You're going to run out of time before you finish answering my questions, Judge Settle's questions. You've got – now you've got – you're up to the nystagmus. He steps out of the car. Do we take into account the behavior, the rapid speech? When you've got the nervousness and the fidgetiness, he asks him, where is your registration? The registration is in the glove box. He fumbles around. He can't find it. But his girlfriend, within a split second, looks at it and finds it and gives it to him to give to the officer. Then you've got the muscle rigidity as he's doing the pat down. And then, obviously, Your Honor, if you're an officer and you can see it in the videotape, you can see their face, they don't know what's going on. They see this man in this odd, combative and almost paranoid behavior where he's yelling at his girlfriend, be careful for your life, you know, you're in danger, run. And obviously, you know, she knows that none of this is happening. She stays in the car. I mean, she's not going to follow that type of advice. And then he's talking. I mean, and the officers, they didn't do anything that would even warrant any of these observations, these persecutions. And they basically, you know. What was the basis for the frisk? The basis for the frisk is before the officer's safety. In short, that's the basis for the frisk. Before the officer gets to the passenger window, he sees, and that is admitted by Mr. Niedermeyer, he sees him reach in the back. And apparently what we found out at the deposition is that he reached in the back to get his wallet because that's where his driver's license is. So he sees that. He comes. He sees that the suspect is animated, combative, is not following orders. I mean, he wants to be in the middle of the freeway, of the roadway. Why did he ask the question first, again, what's your destination, and then followed up with a frisk if he was concerned about officer safety? Then the very first thing one would have done, a reasonable officer, is do the frisk if he believed that he might be armed. But he did it immediately after, again, asking him what the destination was. Absolutely, Your Honor. When he asks him about where are you going, it's part of a 22 questions that as a DRE he is trained to ask. Okay? Because obviously if you're on the South 15 and you're going to Santa Barbara, obviously you're driving impaired because you're not going in the right direction. It's one of the cues. But anyway, he asks him while he's talking to him while the driver is in the car seat. Then he asks him to step back. He walks. Obviously, he cannot do the pat-down out on the roadway, so he has to wait until the driver is on the sidewalk. When he gets to the sidewalk, that's when he pats him down for safety because now they're in close contact with each other, which they weren't before. There was a door separating them. And then as you see the suspect going to the sidewalk, the officer is back of him. So there's no reason to do the pat-down. However, on the sidewalk, when they're standing next to each other, now there's a need to do the pat-down. Well, I didn't really want to divert you from your probable cause factors here. So if you'd finish with that. Yes, Your Honor. Again, you're dealing with an experienced DRE, drug recognition expert. This is someone who's taken over. Is Officer Caldwell's partner also DRE? No. The partner was just standing to the side. He did not participate in any of the tests or anything. And with respect to the FSTs, Your Honor, it is clear, if you see the video, that from the first second that Mr. the driver is refusing to cooperate. And, you know, well, why didn't you ask him to do the FST? Because we know. Because he's refusing to cooperate. We know he's not going to do them. This is exactly what happened after the arrest when the officer said, okay, you know, are you willing to do it? Right. Well, that's, you know, looking at it, I can tell you I presided over more DUI trials than I care to remember. But I would have expected the officer to say that he didn't think that the FSTs could be conducted because of the uncooperative behavior. But instead, the officer said something a little different, that he'd actually outright refused the FSTs. And the video didn't reflect that. How do you respond to that? It's a matter of semantic. It's a matter of degree, Your Honor. When you have a suspect who's telling you, hey, I'm not going to do it. I'm not going to respond to your question. I'm not doing anything here without my attorney. You know that it's not going to serve any purpose to ask him to do an FST. If he can't even respond to you as to a simple question such as where are you going. And this is, you know, this is the situation that was faced by the officer. Let me follow on to what my colleague just asked. One part of this case I am troubled about is Officer Caldwell gave a report to the prosecuting authorities that, at least in part, was not correct. He indicated some things about his composure when he took the license and registration. That's the ERO 182. He said he refused to conduct a field sobriety test. And he stated that Niedermeyer attempted to return to his vehicle. Arguably, none of those things was true. Arguendo, if Caldwell made false statements to the prosecuting authority, what, if anything, does that do to this case? At least insofar as the malicious prosecution issue. Another good thing about this case, Your Honor, is that we have the specific deposition testimony of the filing DA and the prosecuting DA. They both testified that what they read in the report was accurately reflected in the videotape. They both testified that Officer Caldwell did not pressure them in any way, shape, or form to pursue the criminal litigation. As a matter of fact, the filing DA even added a PC-148 charge against Mr. Niedermeyer. Well, wait a minute. My notes suggest that the prosecutor indicated that some of these statements helped him form the basis of his decision to file charges. That's at ER 735, dealing with the refusal of field sobriety test. At ER 752, that he fumbled with his wallet. At ER 755, that he attempted to make his way back to the vehicle. So the prosecuting officer said those influenced his decision. What do we do with that? Well, Your Honor… In other words, he may have lied to them. If he lied to them, how do we treat that? If, in fact, the officer lied to the prosecuting attorney, then obviously the prosecuting attorney could not have exercised his independent judgment. But there is no… And again, I do not agree that it's a misstatement that Mr. Niedermeyer refused the FSTs because he did… This is what the prosecutor said he relied upon. Right. He relied upon the fact that Mr. Niedermeyer… You're saying it's a true statement. I'm sorry? You're saying it's a true statement that he refused to do the FSTs or he's uncooperative in conducting FSTs. I mean, after the arrest, it is true that Mr. Niedermeyer refused to do the FSTs. There's no question about that. It's in the report. You know, obviously, he didn't do it during the time before the arrest. But it could be implied, given his responses, that he wasn't going to cooperate, that he wasn't going to answer any questions, that he wasn't going to do without an attorney. And then after he's arrested, he's asked, okay, will you do the FSTs? No. I've already told you. Okay. I think we let you go over time here, but do either of my colleagues have additional questions? Probably, but it might be… No, no. If you have questions, go ahead. I'll stick with where we're at. Okay. Then we thank you for your time. And we have… the other counsel has some time for rebuttal. Something like that. We may give you a touch more because we've given him a little bit more. We had questions, so… Let me address the point that you made, Your Honor, and that is what is probable cause for a DUI arrest in California? It is the results of an FST properly administered. It includes tests that determine balance and coordination. The videotape shows us that although Mr. Niedermeyer got down on the ground, he got up with perfect coordination and balance. He did not waver. He was on one leg, which is, you know, there's an FST battery that's… Well, you would characterize his behavior as unusual, at least, if not bizarre, wouldn't you? I wouldn't call it bizarre because he was afraid of the sky. The moment the officer accused him of weaving all over the road, the videotape in the car went on, which reflected both of their positions that this was suspect. And when he threatened to arrest him for not telling where he was going, that suspicion and that fear rose. And the behavior was consistent with that. Are you saying that there's nothing in his behavior that could have been used by Officer Caldwell in formulation of his determination of probable cause? Not as a competent DRE. If he's going to accuse this man of being under the influence of a central nervous stimulant, he's got to have the hallmarks of a central nervous stimulant. And he didn't. They're not there. The evidence, I won't go repeating it, but to finish probable cause, balance and coordination was disputed. The eye test was disputed. Contrary to what counsel says, when the eye nystagmus test was done when he was sticking his head out of the car, the officer said he didn't show any nystagmus, so therefore he's not under the influence of alcohol. And he wrote in the report, watery and bloodshot, didn't mention that there was a pupillary reaction. He made that up later, much later. I think you think you're in the trial court. But in any event, let me ask my colleagues whether probable cause would be. We thank you for your argument. I'm sorry that we don't have more time because we know that you both have a lot more that you would say. But we appreciate your argument, and we will take all of this into consideration. The case just argued is submitted.
judges: M. Smith, Nguyen, Settle